May it please the Court, good morning. I am Stephen Brown on behalf of Plaintiff Appellant Commercial Bank. This case is a dispute about a breach of contract and about Land O'Lakes' attempt to terminate the party's contract without cause. Commercial asserts that Land O'Lakes had no right to do so. Instead, under the party's Amendment No. 2, the parties agreed that Land O'Lakes was required to purchase 85 million woven poly bags each year from commercial for the entire term of the party's agreement, which was a five-plus year term. Although Amendment No. 2 does not include a separate termination provision, it is an agreement, and that initial supply agreement permits termination only for cause. There was substantial evidence before the district court supporting commercial's contention that this was the party — that this was the deal the parties had agreed to, that the parties had agreed it would be a long-term deal that could be terminated only for cause. There was testimony by commercial witnesses. There were communications from Land O'Lakes, both internal and external, and there were the commercial realities of the deal, that commercial submitted prices that were based on a long-term deal that only made economic sense in the context of that long-term deal. The district court, however, relying on an earlier amendment, Amendment No. 1, which did, in fact, include a without cause termination provision in favor of Land O'Lakes, the district court determined that Land O'Lakes could terminate without cause. Now, if the district court is correct that Land O'Lakes did have that right to terminate without cause, that right only existed in the party's agreement as a result of a mutual mistake. Giving Land O'Lakes the right to back out of the deal with 90 days' notice and without cause was not intended by either party, and the contract should be reformed and the district court's dismissal of commercial's reformation claim should be reversed. Even just focusing on the plain language of Amendment No. 2, commercial contends that Amendment No. 2 states that it is a — and defines the party's agreement as their initial supply agreement, does not mention Amendment No. 1 anywhere, and does not mention without cause termination anywhere. Well, it does end with, unless otherwise terminated in accordance with the agreement. Correct? Yes, Your Honor. Amendment No. 2 concludes that language, and commercial submits that the reference to the agreement in Amendment No. 2 is exactly the plain language of what the party said it was, which was the initial supply agreement. If you look at the definition of the agreement in the preparatory statement to Amendment No. 2, it expressly states the agreement is the certain packaging material supply agreement dated January 2015, which is the initial supply agreement. There's no reference anywhere to Amendment No. 1, and no reference anywhere in that amendment to without cause. Of course, Amendment 2 doesn't have your word initial, right? It says in accordance with the agreement. Yes, Your Honor. But to my understanding, there's no dispute about what agreement that's referring to, because it says that packaging material supply agreement — pardon me, Your Honor. Sorry. It says, whereas LOL and supplier entered into that certain packaging material supply agreement dated January 1, 2015, and January 1, 2015 is the date of the initial supply agreement, and is intended under the plain language commercial asserts to refer to that initial supply agreement only. And Amendment 1 also refers to the same agreement, correct? Yes, Your Honor. And they say it's amended with the sentence that says terminate without cause, correct? That is correct, Your Honor. Okay. Proceed. Your Honor, even focusing on that plain language of Amendment No. 2, which Your Honor just walked through, commercial submits that at the very least, its interpretation of Amendment No. 2 as permitting only for cause termination is a reasonable one. And if the Court does not agree that commercial's interpretation unambiguously is correct, at the very least, commercial submits that its interpretation is reasonable, and if its interpretation is reasonable, then the district court's conclusion that the contract unambiguously said what Land O'Lakes claimed would be an error, because if the district court you said it was unambiguous, right? The district court, that is correct. I'm sorry. Your position in the district court was that it was not ambiguous, right? The, yes, commercial's position before the district court was that it was not ambiguous. We cite Eighth Circuit case law saying that that is not a waiver of commercial's contention. Particular to that waiver point, Your Honor, I would say commercial is advocating for the exact same interpretation that it did before the lower court. Commercial is saying that this is what the contract means. This is the exact argument that it made before the lower court.   to have unambiguously supported Land O'Lakes' interpretation, the district court necessarily determined that commercial's interpretation wasn't reasonable. And this is before this Court as a matter of law and subject to Geneva review, and this Court should be able to determine, as a matter of law, that Amendment No. 2 is ambiguous and, therefore, the district court's determination should be reversed and the issue should be decided by a jury. I want to point out to you. That doesn't sound like a mutual mistake argument, though, counsel. That's an ambiguity argument. That is correct, Your Honor. There are two alternative bases for commercial's contention with respect to the termination provision. So commercial pleaded both a breach of contract claim, which is based on the plain language of the contract, and commercial also pleaded an alternative claim for mutual mistake and seeking reformation based on mutual mistake. Both of the claims were dismissed by the district court on summary judgment, and commercial is seeking reversal with respect to both of the decisions. I'll focus today on termination but want to briefly touch on two other bases for reversal that commercial has asserted, one of which is the district court determined that there was no quantity requirement in the contract. This is something that not even Land O'Lakes contended. Land O'Lakes admitted in response to an interrogatory that it had to purchase at least 15 to 20 percent of its woven poly bag needs. And for that reason and the reasons also stated in commercial's briefs, commercial Counsel, if they've got the right to terminate it on September of 2020, just by August 2020, by sending you a notice, then that preempts any amount, quantity requirement. Correct? So, Your Honor, I would disagree with that for two reasons. Well, except the premise. I know you don't agree with the premise. But if they terminated it, until then they were buying well over 15 to 20 percent, right, up through August 2020? I believe that's correct, Your Honor. Sure. So the quantity argument depends on the termination argument. They're codependent, correct? I don't. So, Your Honor, there's two different things. I don't agree that the quantity argument depends on the termination argument. So the termination, so we do have arguments with respect to termination, both mutual and stake. What commercial is appealing is the decision by the district court that there was no quantity requirement. The district court looked at the contract as a matter of law and said that there was no quantity requirement in the contract. Commercial is appealing that decision as a matter of law. Well, let's try it a different way. If this court were to agree with the district court that the termination was proper, would there be any reason to address the quantity issue? No, Your Honor. Thank you.  So, with respect to the quantity requirement, commercial also asserts a breach with respect to Land O'Lakes' failure to pay for plates and dyes. And on that claim, I will rest on the briefs. I want to move now specific to the reformation claim, Your Honor, and the termination issue. So under Minnesota law, a contract can be reformed if the parties reach an agreement, but the written agreement doesn't inflect the parties' true intentions due to mutual mistake. Now, at the trial stage, commercial will need to support that claim with clear and  And what that means for the district court and what that means here is that the court needs to look at the evidence in the light most favorable to commercial, resolve disputes in commercial's favor, and look at that evidence and determine whether a fact finder applying the clear and convincing evidence standard could reasonably find for commercial and in its favor. And commercial submits that here there was sufficient evidence before the district court such that a fact finder could reasonably find in commercial's favor on mutual mistake. That evidence includes testimony by commercial witnesses that they always believed it was termination for cause. There's also Amendment No. 1, which is the only place where the termination without cause provision shows up. There was evidence before the district court that that was intended to be temporary, that Land O'Lakes sent it to commercial saying it was only intended to accommodate the RFP process. And that RFP process referred to Land O'Lakes' search for a long-term supplier. And then when Land O'Lakes sent out that RFP, it represented to commercial and the other bidders that Land O'Lakes was committing to a five-year deal. And it expected prices consistent with that five-year deal. And that's what commercial submitted. It submitted prices that were consistent with the five-year deal, and the prices that the parties agreed to in Amendment No. 2 were prices that only made economic sense in the context of a long-term deal like the five-plus-year term of Amendment No. 2. There's also internal communications from Land O'Lakes where they describe the deal as a five-year term agreement. There's communications between the parties where Land O'Lakes describes it, says that it wants to officially kick off this long-term partnership. And then there is the absence of contrary evidence. There was nothing before the district court contemporaneous with the negotiation or execution of Amendment No. 2 reflecting that Land O'Lakes actually had the intention after Amendment No. 2 to be able to terminate for cause. Now, I understand that a lot of this evidence is disputed, strenuously disputed by Land O'Lakes. But at this stage of the case, the evidence needs to be construed in commercial's favor. And to the clear and convincing evidence standard, a good illustration of that is the Thiessen v. Red Owl case. The evidence before that case, the Minnesota Supreme Court, is similar to what was here. There was testimony by the parties who had negotiated the contract seeking reformation saying that it was a mistake. There was also communications between the parties indicating that the parties seeking reformation, their interpretation was the correct one. And in Thiessen's, the Court also emphasized the commercial realities of the deal. All of those things are present here. And it's the same type of evidence that commercial relied upon in support of its reformation claim. Moving very briefly, Your Honor, back to the, Your Honors, back to the plain language of Amendment No. 2. Amendment No. 2 starts by defining the parties' agreement as the initial supply agreement. No reference anywhere to without cause termination. No reference anywhere to Amendment No. 1. Now, the case you talked about was Red Owl, right? Red Owl, yes, Your Honor. Yes. Well, I just read a summary of it. And it talks about Scrivener's errors two or three times, as you know, and critical points in the opinion. So, gosh, they set a very high standard here for it. Do you think you've met that high standard? Yes, Your Honor. The point about Scrivener's error, commercial contends that if this without cause termination provision was part of the parties' agreement, it was part because of a mistake. The parties did not intend to pull in that language from Amendment No. 1. Red Owl, the type of evidence that the Court relied on is very similar to what is here. And there, even before Red Owl, there was evidence that the party seeking Reformation was aware and had noticed the potentially mistaken language. But the Court nonetheless concluded that there was sufficient evidence under the clear and convincing evidence standard. After a trial, that is a case that also went to trial. It's not a case that was dismissed at summary judgment. And it was after a trial. And not only was it after a trial, the Minnesota Supreme Court reversed. The lower court had determined no Reformation, and the Minnesota Supreme Court came and said, not only was the evidence sufficient, it was clear and convincing, and clear and convincing enough that the Minnesota Supreme Court ordered Reformation on its own. And, Your Honors, if I may reserve the balance of my time for rebuttal, please. Very well. You may. Thank you for your argument. Mr. Meason, we'll hear from you. Good morning. May it please the Court. My name is John Meason. I represent Appali Land O'Lakes, Inc. Commercial's principal argument on appeal is that the district court erred in dismissing its Reformation claim on summary judgment. Commercial argues that if the without cause termination provision that was in effect was added to the agreement by Amendment 1, remained in the agreement after Amendment 2, it was somehow due to a mutual mistake of the parties. Now, to prove that argument, Commercial was required to show that both parties made a mistake by not removing the without cause termination provision from the agreement. And the standard of proof is not simply clear and convincing evidence. Under Minnesota law, in order to prove Reformation, a party has to come forward with evidence that is clear and consistent, unequivocal and convincing. It's hard to imagine a more stringent civil standard. I haven't seen one. Well, address the Red Arrow situation. The Red Arrow is completely different. There was clear and convincing evidence. The one thing that Counsel didn't actually comment on is the evidence that drove the decision, and that is that the party who was opposing Reformation performed under the agreement for three years as though the mistake had been made. So three years of performance, the Court said, well, clearly that's clear and convincing evidence that even you yourself believed that there was a mistake in the agreement. We don't have that here. We don't have anything close to that here. And that same clear and convincing standard does apply for summary judgment proceedings. So to avoid summary judgment, commercial was required to come forward with evidence that was clear and consistent, unequivocal and convincing to show that both parties made a mistake by not removing the without cause termination provision from the agreement. As the district court held, commercial failed to satisfy that very high burden of proof. With respect to the evidence that the RFPs all contemplated a five-year deal, is that accurate? Well, the RFP comes in for a lot of reasons. If you ask me, I think the strongest argument that commercial has on that is its argument that the Amendment 1 was only intended to be used to terminate unsuccessful bidders participating in the RFP. Now, look at the evidence that is submitted on that. The evidence consists of statements made by Land O'Lakes director or sourcing manager Ryan Thompson in an e-mail and during his deposition that he believed that the extension was meant to accommodate the RFP. Keep in mind that Amendment 2 accomplished two things. It extended the term of the agreement, and then it also added the without cause termination provision. Mr. Thompson's statements don't address the without cause termination provision. They only address the extension. And to put it in context, commercial was pushing Land O'Lakes for price increases. And so what Mr. Thompson was saying is, look, we only want to deal with the extension now. We'll deal with pricing and other issues after the 2017 RFP if you're the successful bidder. So those statements had nothing to do with the without cause termination provision. The other thing that commercial relies upon with respect to the RFP is a snippet of deposition testimony from its witness, Dean Danner. And during his deposition, Mr. Danner said that he believed that the purpose of Amendment 1, quote, according to Mr. Thompson, close quote, was to terminate unsuccessful bidders participating in the 2017 RFP. Now, Mr. Danner didn't offer any specific facts or details to substantiate that allegation, either during his deposition or in the affidavit that he submitted in opposition to Land O'Lakes' motion for summary judgment. So we don't know if Mr. Danner was referring to some statement that he believes was actually made or whether he was simply extrapolating based upon an e-mail message or something else. Mr. Danner's statement on his face is insufficient to satisfy the clear and consistent, unequivocal, and convincing standard. In fact, that statement wouldn't be sufficient to withstand summary judgment under the ordinary standard because it's completely devoid of any specific facts. Like, was a statement actually made? If so, what was actually said? To whom was the statement made? When was the statement made? How was the statement made? None of those details or specific facts were disclosed by the snippet of testimony in Mr. Danner's deposition. So even if you would apply the basic standard for summary judgment, it would be insufficient as a matter of law to create an issue of fact. And then we know from undisputed evidence that the 2017 RFP was completely unrelated to the without cause termination provision. How do we know that? First of all, the decision to add the without cause termination provision to the agreement was made in May of 2017, long before Orlando Lakes decided to issue the 2017 RFP. That fact's undisputed. Also, we know that at the time this agreement was being amended to include the without were also being added to include that provision. And those suppliers weren't participating in the 2017 RFP. So again, it was part of a plan to do it that was unrelated to the RFP. And then most importantly, the without cause termination provision was not used to terminate the unsuccessful incumbent supplier from the 2017 RFP. That supplier was Mondi. Mondi had an identical contract. It had an identical amendment that contained a without cause termination provision. And yet Mondi's contract was allowed to go until its end in the end of December of 2018, a full year after the 2017 RFP. So we know based on undisputed evidence that the without cause termination provision was completely unrelated to the 2017 RFP. Now... They were going on at the same time, though, right? Sure. And they were in the same contract. But that doesn't mean that they were related to each other. Land O'Lakes, in the spring of 18, decided to amend all of its contracts to include without cause termination provisions. So long before anybody even thought of the 2017 RFP, Land O'Lakes was implementing a plan to include that. How do we know that? Land O'Lakes' director of sourcing, Galen Hershey, testified that he made the decision to include without cause termination provisions in all of Land O'Lakes' contracts in the spring of 2017. Based upon Mr. Hershey's decision, Land O'Lakes' contracts attorney, Noreen Quick-Lindberg, testified that she was instructed to include without cause termination provisions in Land O'Lakes' templates. She then proceeded to include a without cause termination provision in the amendment template in May of 2017. The contract template wasn't amended until the following spring, and the reason for that is that Ms. Quick-Lindberg went on maternity leave during the second half of 2017 and so wasn't there to amend it at that time. And that's also why the sample contract for the 2017 RFP did not include a without cause termination provision. It just hadn't been modified at the time of the RFP. So we know that Land O'Lakes didn't make any mistake in doing that, and keep in mind that a commercial was arguing that when Land O'Lakes put out the RFP, it told people there would be a five-year deal. Yeah, it absolutely did. Did it mention the termination provision in the RFP? Did it say it would be a four-cause termination? The sample contract did not include a without cause termination provision because it had not yet been revised. Did the sample contract include a four-cause? Yes, it did, Your Honor. Because, again, that the only the amendment template had been revised at that point. The contract template wasn't revised until the following spring because of the maternity leave. Now, for purposes of commercial Slow down a second. When you're talking about these templates, can you slow down and go through that? What do you mean the amendment template had not been revised? Yeah. So there's templates for these contracts that can be used to fill in information so that they can be used by the business people to create the contract. The lawyers create the template. The clients put in, at least if it's not too complicated, the clients put in the dates and things like that in the names of the signing parties. So in this case, the amendment template was amended in May of 2017. There's no dispute about that, long before in the RFP. The contract template, so that the body, the main contract template that Land O'Lakes uses for suppliers, was not amended until the following spring, again, because Ms. Quick-Lindberg was on maternity leave. But somebody made a decision to issue a contract. What did you call it? A sample contract. A sample contract with the RFP. Correct. And that sample contract, wasn't that designed to show what Land O'Lakes intended the contract to look like? Yes and no. Not for commercial, because commercial was specifically told during the RFP process that if you have a contract already in place, you won't be signing a new contract. This sample contract isn't for you. Instead, if you have a contract in place, we're going to have you sign an amendment instead, which is exactly what happened here. Is that what you mean by amendment template? Yes. That somebody who already had a contract would be signing an amendment? Correct. Rather than this sample that was attached? Correct. And that was specifically addressed. Where was commercial told that? There is a sample question and answer e-mail message that's attached to Ms. — actually, it's attached to my affidavit, and it's referenced in our brief. And interestingly enough, the question that prompted the response came from commercial itself. So commercial asked, what will happen to our existing contract? And what they were told was that if you have an existing contract, we will amend the contract. So — And was that back and forth before the RFP went out or after? As, during. I mean, after this sample contract had been transmitted? Correct. That's correct, Your Honor. And then there was a question that came in from commercial? Yes. And you're saying the response was you will have an amendment. Correct. If you're chosen. Correct. So commercial knew that that sample contract would not apply. Instead, they knew that what they'd be asked — Well, more important for your purposes, I guess, you would say that shows we didn't intend that the sample would apply to commercial. Correct. That, too. And I hadn't even thought of that. That's a very good point, Your Honor. So for commercial, it was going to be an amendment. Everybody knew that, and that's what happened. An amendment was signed to the original agreement, and that — I guess you're saying even commercial, you claim, knew that. Yeah, it was their question that prompted the answer. And that's undisputed by both their testimony and by the e-mail messages that are attached to my affidavit. One other point. What we can't forget about here when we're talking about mistake is Amendment 3. So as the district court found, Amendment 3 confirmed that Amendment 1 remained part of the party's contract. It's specifically referenced in that contract. So based upon that, neither Land O'Lakes nor commercial made any mistake by keeping Amendment 1 and its without cause termination provision in the agreement. So one other point I want to address is there's additional evidence that commercial did not make any mistake here, and it's important. So during the negotiation of Amendment 3, which took place a relatively short time after Amendment 2, commercial's internal e-mail messages repeatedly acknowledged that Land O'Lakes had an out under the contract if it didn't like commercial's negotiating position. Amendment 3, which shows that Amendment 1 was still part of the contract, was signed the following day after those messages. So commercial knew that the without cause termination provision remained part of the agreement after Amendment 2. Now, commercial now claims that, oh, no, what its messages were really referring to was termination for cause. But Land O'Lakes could only terminate for cause if commercial was in default under the agreement. The e-mail messages don't refer to any actual or even potential default. If you look at the first message, it talks about Land O'Lakes wanting input on selecting manufacturers. And what commercial's message says, there's no way are we going to let Land O'Lakes have any input like that. And if they don't like it, they, quote, always have an out under the current contract. That has nothing to do with any default. There's nothing in the agreement that gave Land O'Lakes the right to have any input on selection of manufacturers. So what that message was really saying is if Land O'Lakes doesn't like our negotiating position, it has the right to terminate the contract without cause. And I see that my time is coming to an end. If there are no questions, we respectfully request the Court to affirm the district court summary judgment in all respects. And thank you for the opportunity to argue before the Court today. All right. Thank you for your argument. Mr. Brown, we'll hear rebuttal. Thank you. A few very brief points in rebuttal. First, to the exchange regarding commercial's question submitted in connection with the RFP process. So this is reflected in the joint appendix, page 225. The question was, when would current contracts be terminated and new contracts start? That was from commercial, reflecting that commercial understood or anticipated, based on how Land O'Lakes had represented Amendment No. 1, that commercial anticipated that the contracts would be terminated. Land O'Lakes responded, it depends. If you have a contract with Land O'Lakes now and is recent, we may simply extend our current agreement. It's not definitive. It doesn't say your contract will be terminated. It doesn't say we will use an amendment. Instead, it says we may simply extend the agreement. And when Land O'Lakes sent out that RFP, what it told everyone is that it was committing to a five-year partnership and the sample template agreement was an agreement that had four cause only. There were a lot of questions about evidence, and evidence including, for example, the discussion about whether commercial agreed that Land O'Lakes had an out in the contract. This is addressed in commercial's briefs. Mr. Danner, the person who sent that email, was asked point blank at his deposition, said, no, I was not referring to termination without cause. He was referring to the original agreement and termination for cause because that's what he understood the agreement was relating to. This was at his deposition. It was a point blank question. This is not a self-serving affidavit that comes at the end of the case. To the point about the unequivocal standard, the Hines case says that the evidence can be conflicting on clear and convincing evidence. The Red Owl case, the equivalent here of the performance in Red Owl are the exchanges between the parties and the communications between the parties reflecting their intent. Okay. Thank you very much for your argument. Thank you to both counsel. The case is submitted. The court will file a decision in due course.